**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kevin GORDON, Defendant–Appellant.**

No. 94–3204.

United States Court of Appeals,
Seventh Circuit.

Argued May 30, 1995.

Decided Aug. 24, 1995.

Barry Rand Elden, Asst. U.S. Atty., Haywood E. McDuffie (argued), Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Ellen R. Domph (argued), Chicago, IL, for defendant-appellant.

Before CUMMINGS, EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Kevin Gordon got his fifteen minutes of fame by robbing nine banks in the Chicago area. As a result of his chosen path to celebrity, he is now serving a 387–month sentence in a federal penitentiary. He does not contest his conviction (he pled guilty), but he appeals his sentence on various grounds.

## I. Background

Kevin Gordon was the "15–second bank robber." He got that name because he typically gave tellers whom he was robbing fifteen seconds to hand over money, under implied threat of death. Between February and July 1993, Gordon robbed eight banks in the Chicago area. Seven banks he robbed with a gun; one bank he robbed while pretending he had a gun. Nobody was hurt during the eight robberies. Gordon netted over $100,000 from his robberies, and he proceeded to go on a spending spree. He bought a BMW, jewelry for his wife, and, planning for the long term, began remodeling his home.

On July 17, 1993, Gordon robbed the NBD Bank in Woodridge, Illinois. He showed the tellers a small handgun (a Smith & Wesson .38 caliber revolver) and ordered them to fill up a bag with money, which they did. Gordon then drove away in his BMW, but the bank president drove after him and called the police on his car phone. Gordon led police on a high-speed chase on I–55, eventually leaving the highway by going the wrong way on an entrance ramp and ditching his car on a nearby golf course, where police captured him.

After a hearing, on July 19, 1993, a magistrate judge unfortunately released Gordon on $150,000 bond, secured by the deed to his grandmother's home. The release order included monitoring through an electronic anklet. In October 1993, a grand jury indicted Gordon for robbing the eight banks and for using a firearm in connection with a crime of violence. Gordon continued to be free on bond. On December 2, Gordon and the government tentatively agreed to enter into a plea bargain.

Gordon, however, did not let his bond, electronic anklet, or the impending plea bargain cramp his style. On December 16, 1993, he obtained permission to attend an appeal hearing concerning a denied unemployment compensation claim. He attended the hearing, but on his way home he went to the Beverly Bank on South Western Avenue in Chicago, still wearing his electronic anklet. He held a metal pipe to give the impression that he had a gun, and he ordered the teller to "give me all your money."

This time, however, Gordon was not so lucky. An armed bank security guard confronted him. The government says the guard grabbed Gordon from behind, placed the gun against his back and said "Don't struggle or you will be shot." Gordon did not comply and instead tried to elbow the guard and wrestle with him—so the guard shot him. Gordon says that he surrendered immediately when the guard told him to but the guard shot him anyway. Regardless, Gordon was hospitalized with arm and abdomen wounds. The district court revoked his bond, and the government added an additional count of bank robbery to the indictment. On March 31, 1994, Gordon pleaded guilty to all ten counts. After a sentencing hearing, the district court sentenced Gordon to 387 months in prison.

## II. Analysis

### A. Upical Adjustment for Discharge of a Firearm

■ The district court sentenced Gordon pursuant to U.S.S.G. § 2B3.1, applicable to robbery. As to the Beverly Bank robbery, the district court gave Gordon a seven-level upward adjustment under § 2B3.1(b)(2)(A), which lists specific offense characteristics of robbery. That section reads, "If a firearm was discharged, increase by 7 levels."[1] The district court reasoned that the language of § 2B3.1(b)(2)(A) covered the situation: a firearm was discharged as a proximate result of Gordon's conduct, so Gordon got the increase. We review a district court's interpretation of the Sentencing Guidelines *de novo. United States v. Hardy*, 52 F.3d 147, 150 (7th Cir.1995).

Gordon argues that § 2B3.1(b)(2)(A), even though phrased in the passive voice, applies only where a defendant himself (or an accomplice or co-conspirator) discharged a firearm. He points to the other subsections of § 2B3.1(b)(2), which provide a scale of upward adjustments "if a firearm was brandished, displayed, or possessed," § 2B3.1(b)(2)(C), or "if a firearm was otherwise used," § 2B3.1(b)(2)(B). Gordon argues that it would be senseless to give a robbery defendant an upward adjustment each time a guard or some bystander brandished or otherwise used a firearm as provided in § 2B3.1(b)(2).

The government responds that U.S.S.G. § 1B1.3 limits application of the adjustment, preventing its wholesale application anytime a firearm is discharged or brandished by anyone present. Section 1B1.3(a) provides that "[S]pecific offense characteristics ... shall be determined on the basis of the following: ... all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant...." The government argues that because Gordon struggled with the security guard after being told to stop struggling or be shot, Gordon "induced ... or willfully caused" the discharge of a firearm, and thus is subject to an upward adjustment under the specific offense characteristics listed in § 2B3.1(b)(2).

■ While the government's theory has some surface appeal, we conclude that § 2B3.1(b)(2)(A) cannot be rationally applied to situations such as Gordon's. The verbs § 1B1.3 uses all contain an element of specific volition, an actual intent or desire that one's actions create the specific result. Therefore, a defendant cannot be said to have induced or willfully caused a guard to discharge a firearm simply because he committed the underlying offense of robbery, for that by itself shows no desire or intent regarding the firearm discharge. Moreover, a defendant cannot be said to have induced or willfully caused a guard to discharge a firearm simply if it was "reasonably foreseeable" that the defendant's actions would lead to the discharge. In the Sentencing Guidelines, "reasonable foreseeability" applies to the actions of co-conspirators, not of bystanders or other non-participants in the crime. *See* U.S.S.G. § 1B1.3(a)(1)(B) (providing for actions of co-conspirators to be considered as relevant conduct in sentencing).

Thus, a defendant could technically fall within the reach of the language cited by the government only in a very narrow set of circumstances, where the defendant had the intent to cause a guard or other non-participant to discharge a firearm. However, a criminal would have to be suicidal to intend that a guard discharge a firearm during a robbery, as the government admitted at oral argument. We do not think the Guidelines were intended to cover such an extreme and unlikely possibility, far removed from the sort of behavior at which § 2B3.1 is directed: use of dangerous weapons by criminals in the course of robberies. *See* U.S.S.G. § 2B3.1, Background. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Central States, Southeast and Southwest Areas Pension Fund v. Robinson Cartage*, 55 F.3d 1318, 1322 (7th Cir.1995) (quoting *Griffin v. Oceanic Contractors*, 458 U.S.

1. Gordon would have been subject to a five-level enhancement for using a firearm during the other robberies, so he is really arguing only for a two-level reduction in his sentence.

564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982)). Section 2B3.1 is not meant to punish attempted suicides, and should not be used for that purpose. Therefore, we conclude that a defendant may not properly be given a sentence adjustment under § 2B3.1 where a non-participant in the crime discharges a firearm. Providing a § 2B3.1 adjustment in this situation was error.

## B. Criminal History Category

The district court added one point to Gordon's criminal history category because of a 1992 domestic battery incident where Gordon had received a diversionary disposition. *See* U.S.S.G. §§ 4A1.1(c), 4A1.2(f). That one point bumped Gordon up to a criminal history category of III.

U.S.S.G. § 4A1.2(f) provides that "[a] diversionary disposition resulting from a finding or admission of guilt ... in a judicial proceeding is counted as a sentence ... even if a conviction is not formally entered...." The Commentary further notes that "Section 4A1.2(f) requires counting prior adult diversionary dispositions if they involved a judicial determination of guilt or an admission of guilt in open court. This reflects a policy that defendants who receive the benefit of a rehabilitative sentence and continue to commit crimes should not be treated with further leniency." U.S.S.G. § 4A1.2, Commentary n. 9.

On January 21, 1993, Gordon had appeared in Cook County Circuit Court on a charge of misdemeanor domestic battery. The following exchange occurred:

> THE COURT: Are you willing to plead guilty to this charge? You're willing to admit you caused bodily harm by striking her in the face?
> THE DEFENDANT: Yes. That's what I did. I can't take that back.

The court thereupon gave Gordon a one-year diversionary sentence of supervision and ordered that he complete domestic violence counseling.

■ We are hard pressed to imagine how Gordon could have more clearly admitted his guilt to the domestic battery charge. Section 4A1.2(f) applies to pleas of guilty in Illinois state court that result in supervision. *United States v. Moore,* 25 F.3d 563, 569–70 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 341, 130 L.Ed.2d 297 (1994); *United States v. Stowe,* 989 F.2d 261, 263 (7th Cir. 1993). Gordon goes on at great length about the constitutional requirements for the acceptance of guilty pleas. *See Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *see generally* Maurita Elaine Horn, *Confessional Stipulations: Protecting Waiver of Constitutional Rights,* 51 U.Chi.L.Rev. 225, 227–28 (1994). However, Gordon's arguments are misplaced. Even if Gordon's guilty plea was not properly accepted, all that § 4A1.2(f) requires is that Gordon have admitted his guilt in some clear fashion; Gordon did that. We find no error in the district court's use of Gordon's admission of guilt to add points to his criminal history category.

## C. Acceptance of Responsibility

■ Even though Gordon pleaded guilty to all ten counts against him, the district court denied him a two-level downward adjustment for acceptance of responsibility. *See* U.S.S.G. § 3E1.1. The district court reasoned that Gordon's ninth robbery was not consistent with a demonstrated acceptance of responsibility, as required by § 3E1.1(a). We review the district court's denial of the adjustment for clear error. *United States v. Yanez,* 985 F.2d 371, 374 (7th Cir.1993).

Gordon argues that he is a manic-depressive and that he robbed the Beverly Bank because he was depressed. At sentencing, Gordon presented the opinion of a psychiatrist that he suffered from a bipolar disorder that "likely ... contributed to the commission of the bank robbery." He does not, however, claim that he was insane, merely that he found it difficult to prevent his own criminal activities. Gordon supplements his claims of depression with claims of stress allegedly created because his habit of robbery was adversely affecting his relationship with his family. For these reasons Gordon says that he was entitled to a downward adjustment for acceptance of responsibility.

We reject Gordon's argument. Whatever the mental compulsions lying behind it, a defendant's conduct that is inconsistent with real acceptance of responsibility is an adequate reason for denying the downward adjustment. *See United States v. Franklin*, 902 F.2d 501, 506 (7th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990); *United States v. Jordan*, 890 F.2d 968, 974 (7th Cir.1989). We agree with the government that it is more likely that Gordon robbed the Beverly Bank because he wanted the money and because he thought he could not receive any additional punishment. The psychiatrist's voluminous report, in fact, supported that theory: it stated that Gordon told others that was why he had robbed the Beverly Bank. The district court properly exercised its discretion in denying Gordon the sentence adjustment.

We VACATE Gordon's sentence, and RE-MAND for resentencing consistent with this opinion.